UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH D.,<br>Plaintiff,<br>v.<br>SSA COMMISSIONER, et al.,<br>Defendants. | Case No. 25-cv-10158-RFL<br>**ORDER GRANTING SUMMARY JUDGMENT; REVERSING COMMISSIONER'S DECISION; AND REMANDING ACTION**<br>Re: Dkt. No. 15 |

Plaintiff Joseph D. seeks judicial review under 42 U.S.C. § 405(g) of the Commissioner of Social Security's final decision denying his disability benefits. Because the Administrate Law Judge ("ALJ") erred in evaluating the medical evidence, Plaintiff's statements, and Plaintiff's residual functional capacity ("RFC"), the denial of benefits was not supported by the record. Plaintiff's Motion for Summary Judgment is therefore **GRANTED**, the Commissioner's final decision is **REVERSED**, and this case is **REMANDED** for further administrative proceedings. This order assumes the reader's familiarity with the Administrative Record, including the findings of the ALJ; the parties' arguments; and the applicable legal standards.[1]

***Medical Evidence.*** First, the ALJ improperly discredited medical evidence provided by Dr. Jillian Elisberg; Dr. Mary LaGue; and Plaintiff's provider, Dr. Aislinn Bird. The ALJ found the marked limitations assessed in these opinions inconsistent with evidence showing "normal findings in affect, speech, attention, memory, and thought process." (AR 34–35.) Substantial evidence does not support this evaluation. In discrediting these assessments, the ALJ focused on several unremarkable mental status examinations and related evaluations throughout Plaintiff's record. (*Id.* (citing AR 675 (mental status examination and surrounding notation); 684 (same); 694 (same); 851 (same); 855 (same); 925 (same); 1019 (same); 1094 (same); 1132 (same); 833–

[1] The Administrative Record ("AR") is available at Dkt. No. 12. All citations to the parties' briefing are to ECF pagination.

845 (LaGue Evaluation Report).) Reading beyond these simple assessments paints a very different picture. In those same records, doctors reported that Plaintiff's "thought content evidenced preservation on negative thinking and hopelessness" including "thoughts of ending his life," (AR 836); he had "severe intrusive thoughts and paranoia" (AR 852); he experienced visual and auditory hallucinations (AR 1018, 1090); and he met the diagnostic criteria for severe depression, anxiety, panic, psychosis, and post-traumatic stress disorder; (*see, e.g.*, AR 904). For example, a March 12, 2025 note which the ALJ cited contained a generally normal mental status examination, but also evaluated Plaintiff as having psychosis, visual hallucinations of "shadows with no eyes or yellow eyes," auditory hallucinations, avoidance of people, and persistent depression. (AR 1018–19.)

Objective clinical tests reported alongside these assessments also show that Plaintiff had severe depression, extreme anxiety with panic, and post-traumatic stress disorder. (AR 837–39; *see also* AR 32.) Downweighing these results because they rely on self-reported evidence, as the Commissioner suggests (Dkt. No. 18 at 4), ignores the very nature of psychological testing, which "will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) ("[S]uch is the nature of psychiatry. Thus, the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness." (citation omitted)). The ALJ provided no other basis for dismissing these clinical tests, which otherwise appear to support the doctors' medical opinions.

Beyond the mental status examinations and routine assessments, the ALJ also cited generally to Dr. LaGue's report. Dr. LaGue did find that plaintiff had some normal results on his mental status examination and in cognitive testing. (*See* AR 34 (describing Dr. LaGue's findings that Plaintiff "was a credible historian with average response time, linear thought process, fair insight and judgment, sustained attention, engaged attitude, and adequate language, abstraction, and orientation as well as normal serial seven tasks with only minor deficit in delayed recall.").) But these limited normal findings do not appear to contradict the remainder of Dr. LaGue's

opinion, including the objective assessment results discussed above. Elsewhere in the report, Dr. LaGue noted that Plaintiff "has a minimal capacity to adapt to changes in the environment or to demands that are not already part of his life" because he "has fewer internal resources to manage stress and mental demands" and his "executive functions like impulse control, frustration tolerance, appropriate responses to stress are all impaired," that he was "socially isolated and withdrawn," and that Plaintiff's symptoms "make interacting with others difficult" as they "prime him to be more irritable, emotionally sensitive, and unable to navigate most social interactions in an appropriate manner." (AR 840–41.) Dr. LaGue's limitation assessments appear consistent with these findings; for example, finding only mild-to-moderate limitations in the ability to understand, remember, and apply information, but finding marked limitations in areas such as cooperating with others, handling conflicts, sustaining an ordinary workday routine, and adapting to changes. (AR 841–42.) The ALJ did not adequately explain how the select normal assessment findings cited, nor Dr. LaGue's opinion at large, contradict these limitation assessments.

Having an appropriate demeanor and engaging with the provider during some doctors' visits does not preclude Plaintiff from experiencing severe limitations in other contexts. Even during medical visits, Plaintiff often demonstrated an inappropriate demeanor. With Dr. Ellisberg, for example, Plaintiff became "extremely distressed," cried, rocked in his chair, repeatedly said "I'm Stupid," and was unable to complete one of the tests "due to his emotional reaction, confusion, and inability to understand instructions." (AR 31, 818–20.) Although the ALJ need not credit every piece of the record or accept an opinion in its entirety, the ALJ must view the record "as a whole." *Pallesi v. Berryhill*, 696 F. App'x 798, 800 (9th Cir. 2017) ("[A]lthough Dr. Holloway and Dr. Luu recorded some normal or mostly normal mental status exams, it is error for an ALJ to pick out a few isolated instances of improvement over a period of months and to treat them as a basis for concluding a claimant is capable of working." (citation modified)). Some normal findings in scattered mental status examinations and assessments are not enough to discredit these opinions when viewed against the record as a whole.

Viewed as a whole, substantial evidence does not support the ALJ's assessment of medical evidence, and specifically the ALJ's assessment of the medical opinions of Dr. Elisberg, Dr. LaGue, and Dr. Bird.

***Plaintiff's Statements.*** Second, the ALJ did not identify sufficiently specific, clear, and convincing reasons to discredit Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms. (*See* AR 30.) Because the ALJ determined that Plaintiff's medically determinable impairments could be reasonably expected to cause his alleged symptoms, and found no evidence of malingering, the ALJ was permitted to reject Plaintiff's "testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Garrison v. Colvin*, 759 F.3d 995, 1014–15 (9th Cir. 2014). To satisfy this, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).

Neither requirement is satisfied here. The ALJ organized their analysis of Plaintiff's testimony as follows: First, the ALJ broadly denotes that Plaintiff reported "limitations in completing tasks, concentrating, understanding, following instructions, getting along with others, handling stress, and handling changes in routine," "having an attention span of a minute," being "unable to work because he cannot be around people," distrusting others, losing jobs due to issues working with others, and leaving job sites out of fear. (AR 30.) Then, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.*) Finally, the ALJ concluded that Plaintiff's "statements about the intensity, persistence, and limiting effects of his symptoms" were inconsistent with medical evidence, which the ALJ described as having showed that Plaintiff "complained of anger issues, sadness, depressed mood, restlessness, difficulty controlling worry, sleep dysfunction, inconsistent appetite, anhedonia, past traumas, feeling overwhelmed, social isolation/withdrawal, disturbing memories, racing thoughts, and/or

disturbing dreams." (*Id.*) What follows next is a sweeping discussion of the record—some of which clearly does support Plaintiff's testimony. (*See, e.g.*, AR 31 (describing objective testing scores "in the extremely low range" and diagnoses of "major depressive disorder-severe, generalized anxiety disorder, and intellectual disability mild vs moderate"); AR 32 (despite a normal mental status examination, a "note showed the claimant reported hallucinations, moderate paranoia, moderate attention problems, mild dissociation, mild concentration difficulties, severe isolation, and severe depression").)

Nowhere in the opinion did the ALJ state what testimony was noncredible or identify specific evidence contradicting this testimony. It is entirely unclear which of Plaintiff's statements the ALJ found to be inconsistent with the evidence. It is also unclear what evidence the ALJ found to undermine this testimony, because the ALJ's opinion is similarly void of specific reasoning. Cataloguing the record does not equate to providing clear and specific reasons for discrediting Plaintiff's testimony, particularly where portions of the identified record clearly support Plaintiff's descriptions.

The Commissioner argues that the ALJ did identify at least two specific reasons for discrediting the testimony: that Plaintiff saw some improvements with medication and that Plaintiff carried on some activities of daily living. (Dkt. No. 18 at 8–9 (citing AR 26–27, 29–35).) But mild improvements such as these "do[ ] not mean that the person's impairments no longer seriously affect [his] ability to function in a workplace," particularly in the face of evidence showing significant, continuing issues. *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001). And the activities mentioned—taking public transportation, shopping at stores, performing household chores (*see* AR 26)—do not equate to functioning in a workplace environment. Riding on a public bus says little about whether Plaintiff can interact with coworkers or maintain regular attendance, for example. As the Ninth Circuit has "repeatedly asserted . . . the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [his] credibility as to [his] overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir.

2001). The ALJ therefore erred by failing to offer specific, clear and convincing reasons for discrediting Plaintiff's testimony about the subjective severity of his impairments.

***RFC Determination.*** Finally, the ALJ erred in determining Plaintiff's RFC because the ALJ failed to adequately support (1) their exclusion of an attendance limitation and (2) their interaction limitations. Beginning with attendance, the ALJ was silent as to this topic in their RFC determination. Dr. Bird, Plaintiff's primary provider whose opinion the ALJ discredited, anticipated that Plaintiff would be absent from work for four or more days per month because of his impairments, and that he would be off-task and precluded from performing a job more than 30% of the time. (AR 1066–67; *see also* AR 33–34.) Although the ALJ stated generally that Dr. Bird's opinion was inconsistent with "the evidence as a whole, which showed normal findings in affect, speech, attention, memory, and thought process," the ALJ did not address the attendance limitations or explain how the mental status and related assessment findings show an ability to maintain attendance. (AR 34.) Nor did the ALJ point to any attendance-related findings in the medical record. To the extent that the ALJ found the record underdeveloped on this issue, it was the ALJ's duty to "conduct an appropriate inquiry" and further develop the record as needed. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). Because the ALJ provided no discussion whatsoever as to the attendance limitation, the ALJ failed to adequately explain this exclusion from Plaintiff's RFC.

The ALJ also failed to adequately explain how they arrived at their limitation determinations regarding Plaintiff's interactions with others. The ALJ determined that Plaintiff "can occasionally interact with supervisors and coworkers but not in a tandem or team setting" and that Plaintiff "can occasionally interact with public on a superficial level such as exchanging pleasantries or directing a customer to the location of the nearest restroom." (AR 29.) But the ALJ did not explain how the evidence supports these limitations. Nor did the ALJ explain why Plaintiff should be deemed capable of broader interactions with supervisors than with members of the public. Evidence in the record does not appear to support this distinction. (*See, e.g.*, AR 840 (finding that Plaintiff "is socially isolated and withdrawn which would present difficulties

relating to and communicating well with supervisors, co-workers and the public."). It therefore appears that the ALJ based this determination on their erroneous assessment of the medical opinion evidence.

Because of these omissions, and because the ALJ's RFC determination was infected by their earlier errors, the ALJ erred in determining Plaintiff's RFC.

***Remand.*** The ALJ's errors in assessing the medical evidence, Plaintiff's testimony, and Plaintiff's RFC likely impacted the ultimate non-disability determination. As a result, the errors were not harmless, and the case should be remanded for further proceedings. When a court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004). A court should only remand for an immediate reward of benefits if: "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.* at 593. Outstanding issues must be resolved here, as described above. This case is therefore remanded to the ALJ for further consideration.

***Conclusion.*** In sum, Plaintiff's Motion for Summary Judgment is **GRANTED**, the Commissioner's final decision is **REVERSED**, and this case is **REMANDED** for further administrative proceedings consistent with this order. On remand, the ALJ may reopen the administrative record and accept any additional evidence as appropriate.

**IT IS SO ORDERED.**

Dated: November 13, 2026

RITA F. LIN
United States District Judge